FIAT DISTRIBUTORS, INC. *v.* JAMES HIDBRADER D/B/A HIDBRADER MOTOR SALES

[No. 1-178A18. Filed October 31, 1978.]

*Don M. Robertson, Thomas Bunger, Bunger, Harrell & Robertson*, of Bloomington, for appellant.

*Thomas A. Berry*, of Bloomington, for appellee.

## STATEMENT OF THE CASE

LOWDERMILK, J. — Plaintiff-appellant Fiat Distributors, Inc. (F.D.I.) appeals from a judgment of the trial court, wherein F.D.I. was granted judgment against defendant-appellee James Hidbrader (Hidbrader) in the amount of $21,075 based on an over payment to Hidbrader, but wherein the trial court also granted judgment in the amount of $12,567.05 to Hidbrader on his counterclaim, which counterclaim was based on F.D.I.'s breach of its contract to buy back certain new and unused Fiat automobiles.

## FACTS

On February 26, 1976 Hidbrader, who operated an automobile retail business in Bloomington, Indiana, gave F.D.I. notice that he was going out of business and that he wanted to terminate his franchise for selling Fiat automobiles. On March 5, 1976 F.D.I. acknowledged Hidbrader's termination and offered to repurchase his current parts inventory and his Fiat sign.

Concerning the repurchase of Fiat automobiles the franchise agreement, which was originally signed between F.D.I. and Hidbrader, contained the following:

> "Repurchase Option — If this Agreement terminates for any reason whatsoever, FDI shall have the option, to be exercised by written notice given within thirty (30) days after the effective date of termination, to repurchase and reacquire from Dealer any or all Fiat and FDI Products in Dealer's stock, as FDI shall in its sole

discretion select subsequent to the date of such notice, and unsold by Dealer to a bona fide purchaser on the day when Dealer shall have received such written notice, including Fiat and FDI Products sold to or in the possession of any person, firm or corporation directly or indirectly owned or controlled by Dealer or affiliated with Dealer by reason of direct or indirect common ownership or control. The price for any Fiat passenger car shall be the Dealer Price at which such vehicle was purchased from FDI (excluding FDI's charge or charges for distribution and delivery) plus taxes paid by Dealer at the time of such purchase and less all prior refunds, credits, rebates, allowances, or discounts made by FDI with respect to such vehicle. If any Fiat passenger car is used or damaged or is not in first class salable condition or is of a type and model not being offered for sale by FDI on such date as a current type and model, then the price for such vehicle shall be a reasonable amount less than that prescribed above, to be mutually determined."

In order to induce the Bloomfield State Bank to finance Hidbrader's inventory of cars, F.D.I. made the following agreement with the Bloomfield State Bank:

"We (F.D.I.) will repurchase in case of termination of this franchise by either party, not more than thirty (30), new and unused current model Fiats. . . ." (Our insert)

After hearing of Hidbrader's intentions of discontinuing his Fiat franchise, D. E. Manning, the President of F.D.I. and an acquaintance of Hidbrader, called Hidbrader and informed him that F.D.I. would buy back up to 30 of the new and unused Fiat cars that Hidbrader possessed. No inference was given that such cars had to be current 1976 models.

Rather than repurchase all of Hidbrader's new and unused Fiat automobiles, of which there were four 1976 models and fourteen 1975 models, F.D.I. helped Hidbrader sell his inventory of new and unused Fiats to other Fiat dealers. Because of F.D.I.'s failure to repurchase the automobiles outright, Hidbrader lost an average of $250 per car, had to expend more than 150 hours in order to complete the selling of those cars, and had to keep his showroom open five months longer than he otherwise would have done.

In July 1976 F.D.I. issued Hidbrader a settlement check for $22,030.70. By mistake another check in the same amount was sent to Hidbrader. When F.D.I. requested Hidbrader to return the check, he refused, stating

that he was damaged by F.D.I.'s failure to buy back all his new and unused automobiles, to buy back all of his parts inventory, and to reimburse him for certain interest, time, and travel expenses for which he claimed that F.D.I. owed him.

F.D.I. brought this action, seeking the return of its $22,030.07 over payment. Hidbrader counterclaimed for the same amount; such counterclaim was based upon F.D.I.'s alleged breach of contract. The trial court granted judgment in favor of F.D.I. on its original action in the amount of $21,075, but also granted Hidbrader judgment on his counterclaim in the amount of $12,567.05, such sum to be a setoff against F.D.I.'s judgment.

## ISSUES

The issues which have been presented to this court for review are as follows:

1. Whether Hidbrader was a third party beneficiary of the buy back agreement between F.D.I. and Bloomfield State Bank.

2. Whether the judgment was contrary to law.

3. Whether the judgment was supported by sufficient evidence.

## DISCUSSION AND DECISION

*Issue One*

F.D.I. contends that the repurchasing agreements between F.D.I. and the Bloomfield State Bank in no way affected F.D.I.'s franchising contract with Hidbrader. We disagree.

The clear intent of the repurchasing agreement between F.D.I. and the Bloomfield State Bank was to provide financing for Hidbrader's inventory of Fiat automobiles. Such a contract obviously was intended to benefit all three business entities.

A third party beneficiary contract is one in which the promisor has a legal interest in performance in favor of the third party and in which the performance of the terms of the contract between two parties must necessarily result in a direct benefit to a third party which was so intended by the parties. See *Jackman Cigar*

*Mfg. Co. v. John Berger & Son Co.* (1944), 114 Ind. App. 437, 52 N.E.2d 363.

In the case at bar the circumstances show that F.D.I., who had a legal interest in Hidbrader's performance of his franchise agreement, intended for Hidbrader to benefit from its assuming the obligation to repurchase up to 30 new and unused current model Fiats. The agreement between F.D.I. and the Bloomfield State Bank clearly qualifies as a third party beneficiary contract.

*Issues Two and Three*

F.D.I. contends that the judgment of the trial court is contrary to law in that the evidence is without conflict and can only lead to one conclusion, but the trial court reached the opposite conclusion. See *Pokraka, et al., v. Lumas Co.* (1952), 230 Ind. 523, 104 N.E.2d 669. We do not agree that the evidence is without conflict and can only lead to one conclusion.

It is F.D.I.'s contention that it was required by contract to purchase, upon termination of the franchise agreement, only new and unused current model Fiats. At trial an F.D.I. representative defined a "New and unused current model Fiat," as one which was a 1976 model which had been driven no more than 80 miles. Hidbrader, on the other hand, introduced evidence to show that F.D.I.'s president, D.E. Manning, told Hidbrader that F.D.I. would repurchase all of Hidbrader's new and unused Fiat automobiles, without distinguishing between 1975 and 1976 models.

It is unclear from the contract itself or from the evidence which was presented at trial what the term "current model," as used in the contract, means. The WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 557 (1961 ed.), gives two definitions of the word "current" which could reasonably be applicable to the issue in the case at bar, as follows:

"current ... (2): occurring in or belonging to the present time : in evidence or in operation at the time actually elapsing [the — Crisis] [—excitement over elections] [—services] (3) of a serial publication : most recent [the number of a quarterly magazine] . . . ."

"Current model Fiat" could be the most recent or 1976 model, or it could be the types of Fiat automobiles which were being marketed by the

dealers and distributors at the time that Hidbrader sought to terminate the franchise. Such was a question of fact for the trier of fact. In that the word "current," as used in the contract and as applicable to the situation in the case at bar, was ambiguous, and in that meaning of the term is not made clear elsewhere in the contract, it was proper for the trial court to consider parol evidence to determine the intent of the parties, and it was proper for the court to construe the meaning against F.D.I., the drafter of the contract. See *Hauck v. Second National Bank of Richmond* (1972), 153 Ind.App. 245, 286 N.E.2d 852 and *McMahan Construction Co. v. Wegehoft Bros. Inc.* (1976), 170 Ind.App. 558, 354 N.E.2d 278.

After weighing the evidence and determining the credibility of witnesses, the trial court determined that F.D.I. had agreed to repurchase all of Hidbrader's new and unused current model Fiat automobiles without regard to whether they were 1975 or 1976 models and that F.D.I. had breached its agreement. In that we are a reviewing court we cannot weigh the evidence nor judge the credibility of witnesses, but we must look at the evidence in a manner which is most favorable to the appellee. F.D.I. testified that in its view a new and unused current model Fiat was a 1976 model with less than 80 miles on it. Hidbrader testified that, after speaking with the president of F.D.I., his view was confirmed that a new and unused current model Fiat was an untitled and unused 1975 or 1976 Fiat of the type which was being sold by dealers and distributors as new cars at the time of his termination notice.

Based on the evidence, *supra*, the trial court, as the trier of fact, found for Hidbrader on the contract. Since there is conflicting evidence which could possibly support a judgment for either party, we, as a reviewing court, must follow the decision of the trial court. We have carefully examined the evidence, and we now hold that the evidence is sufficient to support the judgment and that the judgment is not contrary to law.

Judgment affirmed.

Lybrook, P.J. and Robertson, J. concur.

NOTE—Reported at 381 N.E.2d 1069.